Oh, Mr. Latham, I'd like to note that you're court-appointed, evidently, pro bono. Yeah, well, we very much appreciate that service to the court. You've done a great job. Yeah, I'd seen that on the briefs. All right, the next case of the morning is number 19-20429, Washington v. Paley. And we have Mr. Gilbert first. Ready? Yes, sir. May it please the court, my name is Chris Gilbert, and this morning I have the honor to represent Officer Elvin Paley of the Katy Independent School District Police Department. On November 30, 2016, Officer Paley faced the situation that no police officer, and certainly no school district police officer, ever wants to face. A 6'2", 250-pound, 17-year-old student who was out of control and trying to leave the school building, which all the adults involved agreed put that student in significant risk of harm. What's wrong with this student? He's emotionally disturbed. He's a special ed student. Well, I knew it was special ed, and I knew that everybody felt he shouldn't leave the campus, but it wasn't clear to me what his diagnosis was. He's emotionally disturbed, Your Honor. Okay. Contrary to many of the conclusory allegations in this lawsuit, the evidence shows that numerous school officials worked together as a team to try to stop J.W., to calm him down, and to try to stop him from leaving the building. They talked to him, they let him pace the building, and then eventually they tried to stop him at the doorway. Unfortunately, it just didn't work. Now, Officer Paley did not immediately resort to the use of his taser, but when it became clear that verbal redirection was not going to work, he followed the use of force continuum and moved in to use physical restraint first to try to stop him from leaving the door. Before I turn to the legal issues in this case, I want to address one fact issue that I think has largely gone either unnoticed or sort of underappreciated, and that's that if you look at the video in this case, you'll see that before he resorted to his taser, Officer Paley tried to physically restrain J.W. for 37 seconds. That's a long time in a situation like this. When you read the lower court's opinion, especially page, it's record site 2141, and the appellee's brief, they tend to link Officer Paley's use of the taser with J.W. going to the door. But the video is very clear that there was a 37 attempt to physically restrain him, and that's not a genuine... I was watching the video yesterday, and it was a difficult situation, and maybe it was reasonable to tase him initially, but I guess the troubling fact is how long he's tasing him, and you can even hear, I think, someone else says stop to Paley. It's a very... I mean, we see a lot of tasing cases, not in the school context, but there's one thing about the initial tasing and then how long this one occurred. I'm going to jump to the end of the situation. You hear somebody say stop. I don't think it's clear that he's saying stop to Paley. He could be saying stop to J.W., who's continuing to resist. And I think that's the problem, and that's what makes this case a little... The facts at this stage we have to interpret in the favor of the plaintiff. Right. I don't know that the judge... Well, that's true. But I think in this case, that's what makes this case a little bit unusual, is that most cases deal with distinct uses of force, several different distinct uses of force, and there are temporal gaps in between them where it's easier to say an officer at that point should realize, okay, got him under control, or I've got him handcuffed, no more force, or I need to stop doing this. This is a continuous use of the taser, and we've been unable to find any case that dealt with a question of when you should stop using something like a taser that's a continuous use of force. But they have different registers, don't they? In other words, they produce different volumes, types of impulse, don't they? I believe they can. There's no evidence in the record as to what... Well, what I'm saying is that that might have had an influence on how long he thought he could do it. It could have an influence, and the other thing that's in the record, which I don't think is disputed... But that's not in the record. Well, one thing that is in the record that I don't think is disputed is that when he initially tried to use the taser, it didn't work effectively, as Officer Paley testified, because one of the two prongs lodged in the student's backpack. And this court, in the Pratt decision, actually went into some detail about the fact that when you use a taser, if both prongs don't meet skin, the electricity doesn't cycle effectively. Well, he did tase him, and the fellow went down on his knees. That was essentially the second part of the tasing, when they used the dry stun, which is when you actually make physical contact, not with the wires, but with the prongs directly. That's correct. Right. And then when he was on his stomach, the fellow continued to stun him. While they were trying to handcuff him. And if you look at the video, it's very clear that he stops tasing him before they even get to the point of being able to put the handcuffs on him. And there are numerous cases that say that tasing someone, tasing a suspect, is you do it basically until you reach the point where you have that person under control. And I think that this is the exact sort of second-guessing that the Supreme Court, in cases like Mullinex and Kislow, and some of those cases have said. It's difficult to second-guess a police officer's reaction in a situation that's rapidly evolving, and say, well, maybe he should have taken his finger off the taser button at 10 seconds, or at 15 seconds, instead of 19 seconds. That's the kind of second-guessing that I think the court has warned against. And again, I go back to, especially in a qualified immunity case, there simply are no cases that address the continuous use of force in a tasing situation like this. And I think that's one of the major problems in this case. This court, several judges in this court, have spoken both to the difficulties that police officers face in making split-second decisions about how much force, when to use force, and how much force to use, given the legal complexities of this issue. And other judges have also talked to the case that in a lot of these excessive force cases, the lower courts err by focusing overly much on the question of whether excessive force was actually used. Well, the judge here didn't even seriously talk about clearly established law, in my view. And I would agree with you, Your Honor. I don't think they looked at the right prong, which is whether, and that's the test, whether... And she cites it, whether any reasonable officer could have believed that this was excessive force. But she never applies that in terms of pre-existing case law. And I think that's the interesting point that we make in our brief. If you look at the cases, there just aren't any. There are very few cases dealing at all with force used by police officers in school situations. And there are even fewer dealing with taser situations. There are no Fifth Circuit cases dealing with the use of tasers by a school district police officer against a student. And if you look at the court's opinion, she found three cases that deal with the issue. And those cases, let me get to my notes. Those cases are all district court cases from other circuits. It's Johnson v. City of Lincoln Park, Arteev v. Cincinnati Public Schools, and Geist v. Amery. But if those are the only cases that provide guidance to a police officer in these situations, they certainly would not have put it beyond constitutional doubt that the use of a taser in the manner that Officer Paley used it was excessive force. Because in two of these cases, the courts found, under fairly similar factual circumstances, that the use of the taser by the school district police officer was not excessive force at all. And if you look at the two cases, Johnson v. City of Lincoln Park, there you had a court that said it was an excessive force when a police officer tased a student after that student refused to hand over his Nintendo Game Boy. I have a 15-year-old son, and he probably wouldn't want to hand it over either. But now, admittedly, after he refused to do that, the situation kind of degenerated. They tried to handcuff the student. He pushed back. They took him to the floor. Let me ask you a question. We have the law in this area that's a little strange in the Fifth Circuit. On the one hand, we have Phoebe Herndon from 1990. On the other hand, we have Curran from 2015. And then we have the Supreme Court weighing in on searches in the public schools in the meantime under Bononia. Right. What position do you take as to how we come up with a constitutional standard? Okay. I think Phoebe v. Herndon is still the governing law in this circuit and the cases that have applied it. Curran, which is a school district police force case, although not a taser case, never addressed the issue. And if you go back and you look at the district court opinion on that case, that issue doesn't appear to have ever been raised by any of the parties, either the court or the parties. So the court in that case certainly does not say Phoebe doesn't apply. But if you look at the cases from Phoebe leading on, there are a number of cases that have definitely applied it in the school setting and have said that you really can't bring excessive force claims really under any theory in the public school context. And, yes, Graham v. Conner says that all claims of excessive force against police officers are subject to the Fourth Amendment's reasonable standard. But Graham then goes on to say that we don't use a single standard. You have to look at the sort of factual circumstances. And this is a special circumstance that the courts have looked at. Well, following up on the last part of Judge Jones's question about the Supreme Court saying the Fourth Amendment does apply in the school context for searches, of course you have to take account in determining reasonableness of the fact that the school has a strong interest in maintaining discipline and order. But wouldn't it be strange if part of the Fourth Amendment applied but another part didn't? Yes, but in the field of school law, that's sometimes what we find ourselves dealing with. We have all kinds of cases like TLO where the court says, well, searches are a probable cause everywhere except for schools where there are reasonable suspicions. So obviously the Supreme Court has never addressed the Fee v. Herndon issue, but this court in both Campbell and in Flores v. DeSoto public schools said that you can't use the Fourth Amendment excessive force argument to get around the prohibition on bringing substantive due process claims in student discipline situations. So this is a very narrow situation. It only applies when you're talking about student discipline. But that was actually not an issue below. The parties never argued it seriously, and the court below found that this was a student discipline situation. It is discipline to try to restrain a student. But the court didn't apply fee either. No, the court didn't apply. Well, the court didn't apply fee to the excessive force claim. The court did apply fee to Officer Paley in the bodily integrity situation. It's my opinion that the court was bothered by the fact that he was a police officer. No, I think what the court was bothered by was that fee was decided in 1990 and that the landscape of our analysis of these things has changed quite a bit since substantive due process was invoked. I think it's changed somewhat. Obviously, fee is not the oldest case to have applied that. I think the most recent one was Serafina. Well, I know there was a couple more recent ones that cited fee. I was just curious about that, and then at least one of our cases said we don't need to take a position on it. Suppose we did apply the Vernonia standard that what you're looking at is the Fourth Amendment in the school context. Is there any dispute about the safety of J.W. had he left the school at that point? I don't think there's any dispute. Well, I don't care what you think. What does the record say? It's hypothetical. There's nothing really in the record as to what might have happened to him. It says he wanted to go out and cool down. But it's also very clear that he wanted to walk home. And if you listen to the video, he's not just saying it's not like he wanted to step outside and have a cigarette and cool down right outside the door. He said, I want to walk home. And yes, there's nothing in the record that says how far did he live, what was the situation. But you can imagine this is a large public high school in a suburban area. We have to guard against the possibility of danger and the possibility of harm to a student. He could have been hit by a car. He could have been grabbed by a stranger. I mean, there's obviously many things he could have done. And the school people obviously wouldn't have even known, even if he safely made it to his house, who's there. Is anybody there to protect him and help him? You've been sued on that end, too. We have, Your Honor. So I think in this case, but I would go back. I think Flores in 2004 is the last case that really, in this court, that substantially addressed the fee issue. And that's the case where this court specifically addressed the issue the plaintiffs are raising, which is that this is not a substantive due process claim. This is an excessive force claim under the Fourth Amendment. Well, if it is, then how do you, would you apply the Fourth Amendment in this context? Well, I think in that case, that goes. Does that mean that you can tase a student more or you can tase a student less or you can tase a student in light of his mental disability and the fact that you need to protect him and the people in the school? I mean, you know, it's complicated. I think that's going to be a fact by fact. It's obviously going to depend on the circumstances of the situation facing the officers. I think you use the taser. I think you have to take into consideration the duty of the school officials, whether it's a police officer, a teacher, administrator, to protect the safety of these students. But I think in this case, you look at the force continuum and the officer was simply moving up the force continuum. And like I said, really there were two decisions here. It was the original decision to move in, which frankly, I know the court said there's a fact issue, a genuine fact issue over whether he pushed somebody. I don't think that's a material issue because all he says is that that was when he decided to move in. He didn't move in because J.W. was assaulting Johnny Oglesby, the security officer. He's very specific. He moved in as all of them were trying to do because that's the point where he was getting out the door to leave the building. Apparently there were three of them trying to physically restrain him. That's correct. It was Officer Paley, Officer Molina, and then the security officer Oglesby were trying to restrain him. And again, if you look at the video, they tried for 37 seconds and it didn't work and it was only then that they resorted to the taser. Thank you. Thank you. Thank you for keeping to the time. Mr. Riley. Let me ask a preliminary question. I believe J.W. is now an adult legally. Is that right? That's right. Okay. So I suppose he's chosen to pursue this lawsuit. That's correct, yeah. And as I think you may have noticed in the brief, we've also dropped referring to him as J.W. I may occasionally refer to him as Jevon for the same reason, that he's now an adult. Okay. Great. I guess I'd like to begin just with the Curran case because I think it actually goes directly to some of the questions that were asked of my colleague on the other side. Curran, of course, was a 2015 decision issued just over a year before the incident that gave rise to this lawsuit. And I think, as the court already knows, Curran was involved in other school resource officer in the school setting who raised qualified immunity as a defense to a student's Fourth Amendment excessive force claim, and the district court denied that. And in affirming the denial of qualified immunity, this court said something that I think is very important. It said, it offered this rationale, very straightforward. Quote, slamming a student's head into the wall after her resistance has ceased is a violation of clearly established law. So that was a ruling on clearly established law in the Fourth Amendment context, in the school context. And I think that fact on which this court's decision in Curran rested is almost identical to a fact that the district court found here, and that is here, and this is that page, 2141 of the record. The district court, I'll just read this quote, Officer Paley did not stop using the taser when J.W. stopped resisting. The district court also noted consistent with that finding, this is at 2116 of the district court's opinion, this use of the taser on J.W.'s upper back continues after J.W. is lying face down on the ground and not struggling. I think that's a key fact because I think one of the things that you heard my friend Mr. Gilbert mention during his presentation was, well, the officer was continuing to apply the taser even after J.W. was on his knees and even after he was on the ground because J.W. was still struggling. That's contrary to what the district court said. I think it's also contrary to what you see if you look at the video. It sounds like the court's already familiar with it. Well, Curran was a 15-year-old girl, right? That's correct.  And she hadn't zoomed through the halls cussing out everybody right and left, right? I think that's correct, but there's no dispute that in Curran, the student had committed a battery on the officer only moments before the officer used the force. That was ultimately the basis for the Fourth Amendment violation. But she wasn't 6'2 and 250. That's right, although I would note that, you know, there have been other cases, tasing cases, in fact, like Darden where the individual involved was even larger, 340 pounds, and it happened in a context where it really was more of a rapidly evolving, highly volatile series of events, right? Darden is a case where you're in a private home during a drug bust. No one knows what's happening in there. Newman, another tasing case, you're out on the street. There are several other individuals. Here we have a single individual who we know is unarmed who's a child with an intellectual disability. We think that when you look at the full context, the fact that J.W. is 6'2 doesn't suffice to bring this outside the context of those other cases. Well, let me ask Curran's a case I'm a little familiar with. Let me ask another aspect of it. The defendant never raised the fee defense that the defendant's raising here. Now, maybe you could say maybe that's because no one thought it applied to a Fourth Amendment claim, but how do we deal with the fact that that was not an issue in the case? Right. I think for the purposes of qualified immunity, the fact that the officer never raised this sort of fee defense doesn't change the fact that Curran remains clearly established law. So I would point the Court to its own language in Kinney, which was echoed in Newman and echoed again in Ramirez. Kinney says, referring to qualified immunity, the central concept is that of fair warning and, quote, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights. So I don't think an officer at this point in time, certainly in 2016 when this incident arose, could read Curran and not understand that using excessive force on a student who had ceased resisting violated— Well, that's a real interesting application of the evolving standards of justice, but it really—and I'm really just saying that in jest. But, in fact, fee involved a claim of excessive corporal punishment. So fee might well have been a Fourth Amendment case had Graham v. Conner been decided before 1990, if you see what I mean. So what puts any school enforcement officer on notice? If the Fifth Circuit can miss a case like that, in all honesty and quite easily explained, how can you expect the high school discipline officer to know? Sure. A couple of responses. I guess first, just very briefly, Graham was decided in 1989 before the fee case. Now, I recognize I think fee may have been pending at the time Graham was decided. It may well be that the panel in fee was not yet aware. They may have done—I doubt that, knowing the panel very well. But at the same time, Ingraham v. Wright seemed to set the standard for schools. Right. In the due process context. And I think that's key. Well, due process meant corporal punishment. And what is this except punishment to keep the kid in school? Well, I think this is actually quite different than corporal punishment. And the reason is, even if it could also be classified as corporal punishment, which I don't think we can, and I would point the Court to Officer Paley's own declaration at page 636 of the record, where he says officers are not involved in discipline. But even if you set that aside for a moment, even if we were to classify this as a disciplinary action, notwithstanding the fact that tasers aren't typically used to discipline students, it's also very clearly a Fourth Amendment seizure. And so we're not disputing that you could potentially classify— I mean, I think our position is that this was not discipline, but even if you did classify this as corporal punishment, it is also very clearly a Fourth Amendment seizure. This is a law enforcement officer using law enforcement tools, taser, handcuffs, calling for backup, law enforcement training, use of force continuum, soft and hard hand techniques, and then calling the prosecutor's office afterwards to recommend resisting arrest. I don't think there's any dispute that this is still a Fourth Amendment— What if the assistant principal had done the same thing, grabbed the taser from the officer and was the one deploying it? Would the analysis be any different? Does it matter that it was the police officer? I think it matters. I don't know that it's dispositive. I think it matters in determining whether or not it's a seizure. And that's consistent with this Court's case law and the Supreme Court's case law in defining what is a Fourth Amendment seizure, going all the way back to Terry, right? The quote in Terry for defining a seizure is, whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person. Now, there may be instances of conduct, maybe even the one that you just identified, Judge Costa, where it satisfies both the definition of a Fourth Amendment seizure and the definition of corporal punishment, where there is some pedagogical purpose. If that's the case, this Court should do what it's always done, what it did in Flores— excuse me, what it did in McAllister, and what the district court did here, which is apply both standards, apply the Fourth Amendment standard to the Fourth Amendment claim and apply the substantive due process standard to the substantive due process corporal punishment claim. There's no dispute here, I think, that a given course of conduct by the government can give rise to multiple constitutional violations, right? Imagine if this entire incident had unfolded because the officer wanted to suppress J.W.'s speech about something. It would be the same course of conduct, but you might also have a First Amendment claim, and that would be resolved under a First Amendment standard. So I think all these cases actually are— Well, let me ask you, though, you are talking about why this would violate the Fourth Amendment if the Fourth Amendment applies here via Curran. You are not, in my view, sufficiently explaining why Curran is, quote, or he had no right to continue tasing? We're saying both, but we think it's a clearer case on the continued tasing. Well, then, I mean, there's no law on that at all. I mean, there's no law on that at all, much less clearly established. I think there is, and I think it is Curran, right? But then you have to go beyond Curran. Well, I think we do go beyond Curran, right? We say that— Well, then it's not clearly established. If all Judge Rosenthal could cite was three district courts, two of which denied liability on qualified immunity grounds, then how can you possibly say the law was established beyond per adventure? I think because it's not just Curran that we're up against here, right? It's Curran as well as Graham, right? So you have to look at the specific ambiguities that the officer is trying to identify here to inject into this case, right? One ambiguity is, well, is it fee, is it a substantive due process standard, or is it a Fourth Amendment standard? We think Graham answers that question very clearly. Curran builds on Graham by applying Graham in the school context to a student's claim of excessive force, and specifically to this claim of after a student has ceased active resistance, can the force be justified? In this case, I think it's telling to just look at the time— and I should say on top of that, you have cases like Newman and Ramirez, where this court has said that lawfulness of force does not depend on the precise instrument used to apply it, right? So the fact that the officer in Curran was slamming a student's head into the wall, I think is still fair notice that using an even more extreme force like tasing would still— the same principle about once a student has stopped actively resisting that you can no longer use extreme force, that applies with, I think, even greater clarity in the tasing context. I would just point the court to some of the timestamps on the video, which I know the court is familiar with. I think the officer—I mean, excuse me, the officer raises this question about second guessing and hindsight and how many seconds are we really supposed to be parsing. JW hits his knees at 12 minutes 46—I'm sorry, 12.46 and 40 seconds he's on his knees. Officer's continuing to tase, and that's after the initial deployment of the taser. He's on his knees for five seconds. At five seconds, at 12.46, 45, he goes to the ground, flat on the ground on his back. He's continuing to be tased for another 10 seconds after that, after he's already lying flat on the ground. So that 15 seconds of tasing that occurs after he's already gone to his knees, I think is an identical period of time to the length of the tasing in Newman, where, as this court noted in its Newman opinion, you had three five-second cycles of a taser. I think it's also useful to think about that period of 15 seconds out of the full 19 seconds of tasing that was at issue in this court in the context of other, even less extreme uses of force. You could imagine a situation if JW had gone to his knees at the exact same time stamp, 12.46, 40, and then five seconds later, after he's not resisting, the officer Paley were to punch him, and then he goes to the ground and is lying flat starting at 12.46, 45, and then 10 seconds after that, Officer Paley punches him again. I don't think we'd have any question that we're not second-guessing the officer at that point. In fact, there are cases along those lines from this court. We cited the Trammell case in our brief. That was an instance of three seconds after an officer gave someone, after a minor traffic violation and instruction, he failed to obey. The officer tackled him. This court said that was enough time. Are you aware that the Supreme Court has stated more than once that it hasn't decided the extent to which lower court, that is to say court of appeals decisions are relevant to clearly established law? I think that's right, and we understand that. And there is no Supreme Court tasing case? That's right, although I think, again, again, I'm pointing to this court's law, not the Supreme Court's law. This court in Newman has repeatedly said that the instrument of force isn't dispositive. You don't need to use the identical instrument in multiple cases. I mean, the Mullinex case made quite evident that the court said you can't second-guess the types of measures that are used to restrain people in the Fourth Amendment context. That's right, and I think the Mullinex case, when it makes that second-guessing language, I think that's not disturbing this court's, again, precedents in Newman, Ramirez, Darden, Curran. We're not just talking about one kind of isolated new novel context here. We're talking about tasing, right, this extreme use of force, so extreme in this case that it caused J.W. to defecate and urinate on himself and regurgitate, even under Officer Paley's own declaration. That level of force is much more extreme than some of the levels of force that have been recognized as still giving rise to an excessive force violation in this context where the suspect has ceased resisting. So I think when you look at it in those contexts, it's very different. Mullinex is also, I think, a useful contrast to this case because Mullinex, the officers there, had reason to believe that the suspect was armed. I think the suspect had actually called the police to say, I've got a gun. They were reacting to this highly volatile situation. I just want to emphasize, here we're talking about a single individual who is a child, who all of these is surrounded by adults. He's alone. Let's not call 17-year-olds. I mean, this is a big, big guy. He could be on pro football almost. That may be. I think there's also the fact that he intellectually was operating on a child's level. We know that because he had an intellectual disability. And doesn't that factor into the necessity for force to prevent him from going outside and hurting himself? I don't think so. And I think it's also important to recognize that that's Officer Paley's justification, is that in order to stop some speculative, hypothetical future risk to JW, he needed to send thousands of voltage of electricity through JW. That's very different from what Graham tells this court to focus on, which is Graham, the second Graham factor, which is the one that deals with a threat or dangerousness to others, that talks about an immediate danger to the officer or other bystanders. Here, Officer Paley, taking him at his word, his justification was a speculative future threat to the suspect himself. That's very different. And that's part of the balancing that Graham instructs this court to engage in. He's already struck another student in the chest after kicking his chair over. He's thrown a desk across the room. He's marched through the halls with bad cuss words spewing in all directions. I mean, I would be fearful in those circumstances. I think most people would be worried about the possibility of violence in those situations. Right, and I'd say under this court's case law, all of those things were true in the other cases involving tasing, right? Ramirez, you had the suspect not just cursing at the officers and being resistant, but you had Ramirez, the suspect, was in a private business. That was an environment the officers weren't familiar with. There were other people around, and there was physical passive resistance in that as soon as the officer tried to grab Mr. Ramirez, Ramirez pulled his arm away. And this court said that was the only resistance that was passive resistance. That doesn't justify immediate tasing. Darden's another case I noted earlier. Darden, I know Darden very well, and Darden was not, quote, resisting at all. Well, that was actually a point of dispute. That was a theory. Right, that was a point of dispute, actually, I think, in this court's opinion. That was a point of dispute. Right, exactly, and I think it's a point of dispute here as well. But it was a much different, because he was on the sofa when they came in to do the drug raid. He was the major suspect in the drug raid. He was about the same size as this fellow. Even larger, that's right. Somewhat, maybe, and he goes down on, anyway, it is not comparable. Okay. It's not comparable. Respectfully, I disagree. I think there are other environmental factors in Darden, like the fact that this is a private home, the fact that this was a drug bust, things that this court. Again, that all cuts against clearly established law. I mean, the policeman in the school district can't possibly be thinking about a drug raid in Fort Worth when he's trying to restrain a giant kid who's trying to break out of the school. I agree. My point was just that there were other factors in Darden that cut against the plaintiff, and this court still said on the record there and based on the district court's fact findings that that was at least on that record enough to establish a violation of clearly established law. I think in terms of what the officer in this case knew and whether the Fourth Amendment applies, I think it's also useful to look, and I'm not saying this is a dispositive fact in the Graham analysis or in the qualified immunity context, his own training materials attached to his declaration, and I would point the court to pages 723, 724 of the record. These are his own training materials. They cite Graham. They cite the three factors from Graham that we've been discussing in this case and that the court applied in Newman, Ramirez, Darden, and Curran. The Fourth Amendment does apply subjectively, not subjectively. I agree, and that's why I said it's not dispositive, but to the extent that we're actually concerned about whether he was on notice about Graham in a literal sense, I think it's useful context. That's the only point I was raising. I'm happy to answer any other questions the court has. I think I would just point the court to, just before I sit down, I see I've got two minutes, just a couple of other factual disputes that I think were not acknowledged as factual disputes during the earlier presentation. I think there was a representation made that the first tasing, the initial deployment of the taser, the one that isn't the drive stun mode that I think occurs at 1246.37 in the video, there's a dispute as to how effective that was, and I think the district court noted this dispute where she says at 21.16 that after that first deployment of the taser, quote, J.W. immediately screamed and fell to his knees. That's consistent, I should say, if you actually look at the video. J.W. starts screaming before the drive stun mode happens. So Officer Paley, it's true, suggests that the initial deployment of the taser wasn't effective and that's why he needed to then begin drive stunning, including drive stunning while J.W. is on his knees and on his back. That's actually a point that's in dispute and that the district court recognized is in dispute. There's another dispute about the continuous application of the taser, which I think goes to how intense the force of the taser was. This is 21.16 of the record, footnote one in the district court's opinion. It is not clear from the video recording or the summary judgment evidence whether Officer Paley drive stunned J.W. in separate uses of the taser or if the application, or if application to, I'm sorry, or if he continued activating the taser when moving its application to another part of J.W.'s body. So that's another factual dispute that goes to this question of what was the level of force used, what was the level of resistance leading up to it. The other one I would note is there's a dispute about what was happening during that 30 seconds of blacked out video footage, which I think is highly analogous to the 25 seconds of blacked out footage in Darden. J.W.'s assertion in his declaration, and as the district court notes, is that he was placed in a choke hold during that 30 seconds. So the question of what level of resistance he was engaged in at that point, I think, does depend on whether or not he was engaged in a choke hold, as he says, or whether he was pushing a staff member, as the officers say. So those are some of the factual disputes I just wanted to call the court's attention to. I can see my time is up, unless there are other questions. Nope, you've covered the waterfront. Thank you very much. Mr. Gilbert. Okay. Was Officer Paley's concern about the possible danger to J.W. if he left the building speculative? Of course it was, because he can't predict the future. But we don't need to look any further than this court's en banc decision in Doe v. Covington County Schools, where the school district was sued because they allowed a little girl to leave the school and be checked out by an adult that was definitely not supposed to be checking this child out, at which point she was sexually molested multiple times. So school districts have a concern, and they have to act on those concerns, because unfortunately in this day and age they are all too reasonable. Now in this case, I think it's instructive that the plaintiff sort of conceded that, well, if this had been an assistant principal, yes, fee might have applied. Because I think, again, that goes to it doesn't make a whole lot of sense to draw a line on the application of fee to the question of whether it's an assistant principal or a school district police officer. I totally agree that if it had been a police officer from the last case who had come onto school property for some reason chasing a suspect or even looking to serve a warrant and find a kid and they had gotten into excessive force claim, fee wouldn't apply because that's not a discipline situation. Is there any other case that has tried to limit fee or restrict or categorize fee in that way? No, Your Honor. So it's not clearly established.  Now in terms of the length of the tasing at the end, they pointed to Newman and said, well, that was ten seconds after he hit the ground. But there's no case law that clearly establishes that a police officer must, upon pain of monetary damages and lawsuits, stop tasing a suspect the instant they hit the ground. You tase them until you can get the handcuffs on them. And so if you look at the video, I think it's very clear that that's what was going on. And the fact that it was ten seconds there, again, doesn't really mean anything. If you go back and you look at Pratt, in which they did find that those officers, and again, that's not a school district case, that's a very different case, but in that case, for example, they found that the officers tased the suspect for three full cycles of 40 seconds plus four more tasings, including one in the drive-stun mode, that led to the suspect's death. And yet the officers were entitled to qualified immunity there. So in these cases, it's very difficult to drive any kind of clearly established rule as to whether you can tase somebody for ten seconds, 15 seconds, 19 seconds. Going back to... And I think that's why some of these cases that were cited, Darden, Newman, Ramirez, aren't really all that informative to this particular case. I was going to point out the same thing that Judge Jones did, that Darden was a no-knock warrant drug raid, where at least the allegation, if you accepted the plaintiff's version of the facts, is that he was kneeling on the sofa with his hands up when he was threw to the ground, tased twice, choked, punched, and kicked in the face. Newman, the suspect was alleged to have been hit with a police baton ten times and was just standing there in pain when the police officer pulled his taser and used it. Ramirez, the suspect was tased twice, once just after pulling his arm away from the officer and a second time while he was lying face down on the ground in handcuffs. So those are the sorts of cases where obviously there is a temporal gap between whatever it is the plaintiff did, the suspect did, and the police officer's use of force where the officer should have stopped and rethought what they were doing. And that's true of Curran, too, which is maybe the closest case here, although, again, it's not a taser case. You know, in Curran, you have a very different version of stories. You have a very different version of what happened. If you look at, you know, the student said she was doing nothing physical. There were two incidents of force in that case. The student said initially she's doing nothing physical. An officer grabs for her I.D., which she wore in a lanyard, jerks her backwards and then threw her against the wall. The officer said when he reached for the I.D., she hit him in the head so hard it knocked his glasses off and he placed her against the wall so that he could get her under control. So you've got a very different version of the facts there, which you really just don't have in this case. I mean, it's easy to say, oh, there are factual disputes. But there really aren't that many disputes, and in particular, when you look at the video and you look at what happened. The second incident in that case was even more extreme. The student said she was walking down the hall doing nothing, going to the office, and the officer just slammed her into the wall and the officer said no, she was trying to escape. But for these reasons, we think that regardless of what the ultimate substantive issue would have been, the law was simply not clearly established to an officer, to all officers, reasonable officers, in Officer Paley's position that his use of the taser was unconstitutional. And therefore, we would ask that you reverse and render. Thank you. All right. So thank you very much.